## BROWN *v.* CERTAIN TONS OF COAL.

*(District Court, W. D. Michigan, N. D.    May 4, 1888.)*

1 SHIPPING—CARRIAGE OF GOODS—DEMURRAGE.

Libelant, the owner of three barges, one of them propelled by steam, entered into an agreement for the transportation of certain coal at a fixed price per ton, the coal to be delivered at the port of discharge on board, and to be there unloaded within three days after its arrival. There was no charterparty or contract of hiring in whole or in part, and the entire negotiations were in parol. Bills of lading were afterwards made out in the usual form, and transmitted in the ordinary course of business. Upon arrival at port of discharge, the facilities provided by consignees for unloading were so poor that only one barge could unload at a time, and about 11 days, including one Sunday, were taken up in the discharge. *Held*, that the parol agreement for a discharge in three days was superseded by the bill of lading, and that the consignees were entitled to a reasonable time; that six days, including Sunday, was such reasonable time; and that demurrage should be allowed for the remaining five days.

2. ADMIRALTY—JURISDICTION.

A libel by the owner of three vessels constituting "one ship" against the cargo for demurrage arising from unreasonable detention by the consignee at the port of discharge is within the admiralty jurisdiction of the district court.

3. SAME—PRACTICE.

Where the owner of the ship libeling the cargo for demurrage had knowledge of what had been done by the master, and had proceeded in recognition of it, it is too late for him to object to the authority of the master to execute the bill of lading under which the cargo was carried, on the ground that the bill was made in the home port.

In Admiralty.
*George D. Van Dyke*, for libelant.
*Ball & Hanscom*, for claimant.

SEVERENS, J., (*orally.*) In the case of *Brown v. Certain Tons of Coal*, Wallace being the claimant, the proceeding was in admiralty, and the facts in outline were that the libelant, being the owner of certain vessels, three in number, entered into an agreement for the transportation of certain coal, from Buffalo to Menominee, at a certain price per ton. The coal was to be delivered at the port of discharge on board; that is to say, the expenses of the discharge were to be borne by the consignees. Some preliminary negotiations were had between the libelant and the other parties to the transaction in regard to the transportation of this coal and certain incidentals of the terms on which it should be done. Afterwards the coal was laden, and bills of lading were made out in the usual form, and were transmitted in the ordinary course of business. The vessels proceeded to Menominee, and, on arriving there, the consignees had not provided the facilities for unloading which it is claimed should have been provided, and in consequence only one of the vessels could be unloaded at a time, and the vessels had to take their turn at the dock at a single place of discharge, one after the other; and, of course, the detention would be such as would be necessary from unloading in that way. All of the vessels constituted substantially one fleet; they were not only one fleet, but were, within the meaning of the term in the admiralty jurisprudence, one ship; that is to say, one of them was a steam-barge, carrying a portion of the coal, and the others were two barges that were in tow of the steam-barge. The vessels not being unloaded within the time when it was claimed they should have been unloaded by the owner of the vessels, a claim for demurrage was put in, founded upon the detention of the vessels beyond the time when they should have been discharged, and the coal was libeled by the libelant, for the purpose of enforcing his claim for demurrage.

It is claimed in the first place, on the part of the claimant,—at least it was so claimed originally,—that the case was not one of admiralty jurisdiction; that the remedy could not be had in this way, assuming the facts to be as alleged in the libel; but I have no doubt whatever that it is a proper case for the admiralty jurisdiction, and that the court has authority to award such remedy as the nature of the case requires.

The principal controversy between the parties arose out of the question whether there was a preliminary contract which was in the nature of·a charter-party, and which was therefore entitled to stand independently by itself, as attesting the terms and conditions of the agreement for transportation, or whether what transpired is to be regarded as mere preliminary negotiation· resting in parol, and which was merged in or superseded by the bill of lading, which of course was in writing, and which it is claimed by the claimant operated to supersede the original or preliminary negotiation· between the parties. Now, I have no doubt in this case that what transpired between the libelant and the other parties

to the transaction, by way of parol, was sufficient to have constituted an agreement; that it was within the understanding of the parties, and therefore one of the terms of the agreement, that this coal should be unladen in three days from the arrival of the vessels; and that the consignees should take measures to have the coal unloaded within that time. But no charter-party was made, and I think it must have been intended that the terms and conditions of the contract should be embodied in the bill of lading. It is claimed by the libelant that, where there is a charter-party, or an agreement equivalent to it, that that is the substance to be looked to as the agreement between the parties, and that the bill of lading is a merely formal document, issued by the master, and is not intended to cover the ground of the charter-party. Now, in this case, if there had been a charter-party between the parties to the transaction, I should have no doubt that the contention on the part of the libelant was correct, and that the charter-party must be looked to as indicating the agreement between the parties; but where, as here, there was nothing rising to the dignity of a charter-party, nothing partaking of its substance, form, and effect, but the agreement, such as it was, between the parties, standing in parol, I think that the bill of lading, which was ultimately made, must be regarded as superseding the preliminary arrangements of the parties, and that a different rule would be applicable here from that which would apply if the parties had entered into a charter-party, or other definite agreement intended as the equivalent thereof. And it is to be noted in this case, and is a matter of considerable importance in determining this point, that the transaction between these parties did not have in contemplation the hiring or employment of vessels, or of any definite capacity of those vessels; the parties looked not so much to that as to the simple and only matter that they had in contemplation, which was the transportation of a certain quantity of coal from one place to another at an agreed price per ton.

A question was raised by the libelant as to the authority of the master to execute this bill of lading in the home port,—the port of the owner. There might be a doubt of that if it had stood without any ratification on the part of the libelant; but that bill of lading appears to have been acted upon by the libelant; certainly there is no evidence in the case that he ever repudiated it. It is clear that he must have known of the making of the bill of lading by the master; and therefore the court holds, upon familiar principles of law, that it is too late now to claim that the master had no authority to sign the bill of lading, whether or not he would have such authority if immediate question had been made upon it. Therefore I hold against the libelant upon the proposition that the bill of lading does not supersede what had previously transpired between the parties. The bill of lading must be regarded as attesting the contract between the parties, and it is to be interpreted according to its terms, including also what is reasonably implied in it; for it is a maxim of the law that what is fairly implied in a contract is as much a part of it as though it were expressly written. It was therefore a part of this contract that this unloading should be done within a reasonable time. It being the duty of

the consignee to unload this freight, it was his duty to provide the facilities for doing so. He was bound to promptitude and diligence. The measure of that diligence is to be estimated by the urgency of the case, by the circumstances surrounding the parties, by the loss and damage which would accrue to the owner of valuable vessels by detention during the earning season of the year; and the circumstances in this case required that the consignee should exercise promptitude and a hig degree of diligence in unloading these vessels. I think it was fairly within the expectation of the parties, and fairly within the obligations of the consignee, to provide means of unloading two of these vessels, at least, at a time. All that transpired between the parties seems to have indicated that that was the reasonable expectation which they had. Instead of that, only one of the vessels could be unloaded at a time by the means furnished by the consignee. The dock was incumbered with a quantity of material, of lumber, which lay between the coal-bins and the front of the dock; and I am satisfied from the evidence that the consignee did not procure the necessary help. He refused to pay—whether justly or unjustly, I do not know—the price that was charged by the laborers in that vicinity for unloading a vessel; he higgled over a little difference of 10 cents an hour to those employes, and permitted the vessels to lie there until he could coerce the employes to accept 40 cents instead of 50 cents an hour, thereby attempting to save to himself a mere pittance, while subjecting the other parties to serious loss and damage. It is therefore held that, in this case, as a matter of fact, the consignee did not use reasonable diligence.

As I have stated, it was fairly to be expected that the vessels should have been unloading at least two of them at the same time. This would have required the detention of the third in the mean time, and the detention of the two while the third was unloading. Upon the evidence, in my opinion, five days was sufficient for unloading, with reasonable diligence on the part of the consignee. Inasmuch, however, as the court holds that there was no contract for three days, in which case Sunday would have been included, the intervening Sunday must, upon the facts found, and the law as held, be also allowed, which would make six days from the time of the arrival of the vessels until the expiration of a reasonable time for unloading. This would leave five days for which demurrage would be allowed. The damage from demurrage per day appears to be as claimed by the libelant, and it is not unreasonable, I think, in view of the evidence in the case,—$211.58. That sum is allowed. The libelant is entitled to a decree for five days at $211.58 per day, amounting to $1,057.90, and interest at 6 per cent. from the date of the filing of the libel, and costs, except, of course, such as were paid on the opening of the default.

It may be that the libel should be amended in some particulars. The proctor for the libelant may exercise his discretion about that. Leave will be given to amend the libel, if counsel be so advised, so as to claim demurrage for detention beyond a reasonable time, instead of founding the claim for demurrage upon the agreement to discharge in three days.

All that remains will be simply the computation of the interest upon the sum stated, which may be done by the clerk when the decree is entered.